UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**THU-HUONG TRAN,**

    Plaintiff,

v.                                                                       3:05cv159/MCR/MD

**GORDON R. ENGLAND,**
Secretary of the Navy

    Defendant.
_____/

**O R D E R**

This matter is before the court on defendant Gordon R. England's motion for summary judgment (doc. 25) to which plaintiff Thu-Huong Tran ("Tran") has responded (doc. 32) and Tran's Motion to Strike Defendant's Motion for Summary Judgment and Accompanying Documents, and Plaintiff's Response to Defendant's Motion for Leave to File Motion for Summary Judgment Out of Time (doc. 28). For the reasons that follow, the court GRANTS defendant's motion for summary judgment and DENIES Tran's motion to strike.

**MOTION TO STRIKE**

Before addressing defendant's motion for summary judgment, the court will consider Tran's motion to strike. Tran moves to strike the motion for summary judgment on the ground that defendant filed its motion and accompanying documents approximately fifteen days after the deadline for filing dispositive motions as set forth in the court's Scheduling and Mediation Order (doc. 8).[1] In that order, the parties were directed to file potentially dispositive motions no later than twenty days after the discovery deadline of January 9, 2006. Each of the parties

---

[1] The court entered its Scheduling and Mediation Order (doc. 8) on August 8, 2005.

subsequently filed a motion for enlargement of time to extend the discovery deadline which the court granted.[2] Consequently, the deadline for filing dispositive motions was extended to April 3, 2006. On April 18, 2006, defendant filed a motion for leave to file its summary judgment motion out of time (doc. 24) asserting that he had difficulty obtaining deposition transcripts necessary to prepare the motion and accompanying statement of facts, and that several issues arose during mediation that required attention. Finding there was neither undue delay on defendant's part nor prejudice to Tran, the court granted defendant's motion for leave to file its summary judgment motion out of time. (See doc. 29).

Upon review of Tran's motion, the court finds there is no prejudice to Tran in the late filing of the motion for summary judgment and that the interests of justice are best served by the court's consideration of the motion. Accordingly, Tran's motion to strike will be denied.

**BACKGROUND**

Tran has sued defendant for race and national origin discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981a. For purposes of ruling on the motion for summary judgment, the following facts are undisputed.

Tran is Asian and her national origin is Vietnamese. She began work as an intern in the Education and Training Intern Program ("the program")[3] at the Naval Education Training Command ("NETC") in Pensacola, Florida on July 15, 2002. The program is two years in duration. The first year of the program is a probationary

---

[2] Defendant filed an unopposed motion to enlarge the discovery period by four days (doc. 15). By order entered on January 3, 2006 (doc. 16), the court granted that motion thereby extending the discovery period to January 13, 2006. On January 11, 2006, Tran filed an unopposed motion to enlarge the discovery period (doc. 17) for sixty days which the court granted. (See doc. 18). Accordingly, the deadline for discovery was extended to March 14, 2006.

[3] Upon entry into the program, each intern is given an Intern Survival Guide ("the guide"). The guide provides interns with information on program requirements including Individual Development Plans, rotational assignments, travel, educational requirements, tuition, promotion and leave policies.

period used to determine an intern's overall fitness for federal service.[4]  Each intern is assigned a Homeport Supervisor and a Mentor.  Within thirty to forty-five days of entering the program, each intern is required to prepare an Individual Development Plan ("IDP").[5]  The IDP is a personalized plan developed in conjunction with an intern's Homeport Supervisor and Mentor that is used to track an intern's completion of the program's requirements including homeport assignments, rotational assignments, professional development courses, competencies, graduate level courses, site visits and mandatory conferences and meetings.  Successful completion of the IDP is required for graduation from the program.

Tran was one of ten interns selected to begin the program in July 2002.  Tran's Homeport Supervisor was Sandra Ann Hunter ("Hunter") and her mentor was Janet McGhee ("McGhee").  Hunter assisted Tran in developing her IDP and met with Tran periodically to discuss her progress.  During her probationary year, several incidents occurred that affected Tran's progress in the intern program:

> **(1)** In October 2002, Tran attended a conference in Boston, Massachusetts with two other interns.  While there, she became ill and asked another conference attendee to take her to the hospital on two occasions.  Upon her return from the conference, Tran submitted her travel claim for reimbursement of expenses incurred during the trip, including money she claimed to have paid the other attendee to drive her to the hospital.  Tran did not seek supervisor approval during or after the conference for this particular expense.[6]

---

[4] Tran's position was a career-conditional appointment subject to the one year probationary period. See doc. 1, p. 2, ¶ 8.

[5] See doc. 26, Ex. 20, p. 36.

[6] In her deposition, Hunter averred the following:

A:   So when she came back, it's my responsibility as her supervisor to review and approve her travel.  And when her travel came down, she had a claim on her travel for transportation that wasn't authorized.

Q:   What kind of transportation?

A:   Well, that was interesting.  I could not tell from the travel; so I talked to her and I said, "What happened?  Why did you charge this right here?"  And she said, well, during the time she was at the conference, she got sick and she needed to go to the hospital.  So instead of getting

**(2)    In March 2003, Tran and another intern, Sonja Frazier[7], were scheduled to attend a conference in New Orleans, Louisiana. As required, all travel arrangements for official travel, including hotel reservations, were made by the Travel Office. Tran was given an itinerary showing her hotel reservation. Without prior approval from her supervisor, Tran cancelled her room reservation on the evening she was to check-in and instead stayed with a friend in the New Orleans area. Tran did not advise her supervisor of this change in plans while on official travel.[8]**

**(3)    On March 6, 2003, Tran was absent from work due to a scheduled medical procedure. She failed to notify her Homeport Supervisor or**

---

a taxi, she got somebody from the conference to take her to the hospital, and so she reimbursed them. And this occurred twice.

Q:    Okay.

A:    And so when I sat down and I talked to her, I said, "That's not the way you do things. You take a taxi. You don't go pay somebody. You don't even know who that person is, so you don't do that." And I actually had to go on her behalf to our money people and ask them to reimburse her, because they weren't going to do that.
...
A:    Now, what she should have done – this is what I told her –

Q:    Okay.

A:    – you should have contacted the office. You should have told me that you were sick. If it was at night, you could have called me the following morning. The government would have paid for that phone call. That way I can authorize those kinds of things. See, when we're on travel, – even myself. When you're on travel, only your supervisor can authorize those kinds of things. You've got to check back and say, "Is it okay? But what I talked to her about was just that. When you're out on travel like that, you need to check in with your supervisor and let them make that decision.

Q:    All right. So she should have called you and said, "Can I take a cab?"

A:    She should have called me and said, "I'm sick, Ms, Hunter. What do you think I ought to do?"

(Doc. 35, Ex. 2, pp. 27-29).

[7] Sonya Frazier and Tran were both supervised by Hunter.

[8] Hunter avers in her affidavit that Tran did not call her office during her trip to New Orleans. However, after the scheduled meeting, Tran did call Hunter's secretary to ask for approval to spend an extra night in New Orleans. This request was not approved. Hunter further avers that she counseled Tran again about "the need to follow arrangements made for trips, unless she provided advance notice of, and received approval for, changes." (Doc. 26, Ex. 2, pp. 5-6, ¶ 13).

**Rotational Supervisor of her need to take sick leave in advance.[9]**

**(4)    On March 19, 2003, while on rotational assignment,[10] Tran reported working regular hours and additional credit hours.[11]  Tran did not request credit hours from her supervisor in advance.**

**(5)    After receiving approval to enroll for a specific college course to fulfill part of her internship requirements, Tran dropped the course and registered for other unapproved courses without authorization.[12]**

**As a result of these events, Hunter gave Tran an unfavorable evaluation[13] in which**

---

[9] The guide states that interns are to use the OPM 71 form to request leave and that leave requests are approved by their supervisor. (See doc. 26, Ex. 20, p.17). In her declaration, Tran states that she understood the proper procedures for reporting her absence and that she did not request sick leave in advance from any supervisor. (See doc. 26, Ex. 21, question 35). Tran did, however, contact a co-worker, Larry Wingard, after she arrived at the doctor's office on the day of her appointment and asked him to report her absence to Hunter. Tran avers the medical procedure had been scheduled in advance. (See doc. 35, Ex. 1, p. 62).

[10] During the course of their internship, each intern is required to complete four rotational assignments. Rotational assignments are non-permanent assignments of sixty to ninety days in duration that are designed to fulfill a portion of an intern's IDP. While on a rotational assignment, an intern is supervised by a Rotational Supervisor. Tran was on a rotational assignment at the Naval Education and Training Professional Development and Technology Center ("NETPDTC") at Saufley Field in Pensacola, Florida from February 18, 2003, to April 18, 2003. During that time, her Rotational Supervisor was Dr. Nancy Maloy ("Maloy") and her Rotational Host was Jane Hyer ("Hyer"). (See doc. 26, Ex. 9, p. 1, ¶ 3). Hyer supervised Tran on a daily basis, assigned her projects and monitored Tran's progress while on this rotation. (See doc. 26, Ex. 12, p. 1, ¶ 3).

[11] Credit hours are similar to compensatory hours, although they can only be used for time off, not for compensation. (See doc. 26, Ex. 2, p. 7, ¶ 15). Use of credit hours by NETC employees, including interns, requires advanced approval by their supervisor. (Id.).

[12] Interns are required to take college courses as part of the program and their IDPs. (See doc. 26, Ex. 20, pp. 18-19, 25, 34; doc. 35, Ex. 1, p. 53). However, they are required to obtain approval from their supervisor for their courses in advance and must provide a grade report to their supervisor upon completion of their courses. (See doc. 26, Ex. 2, p. 8, ¶ 17; Ex. 3, p. 133-34; Ex. 20, pp. 25-26). In the instant case, Tran sought and received approval from Hunter to register for a course at the University of West Florida. (See doc. 26, Ex. 2, p. 17; doc. 35, Ex. 1, p. 53). Without Hunter's knowledge or approval, Tran dropped the course and subsequently registered and dropped several other courses before enrolling in one course that she ultimately completed. (See doc. 26, Ex. 3, p. 132; doc. 35, Ex., pp. 54-56). Upon completion of the course, Tran initially notified Hunter of her final grade by email. (See doc. 26, Ex. 3, p. 134; doc. 35, Ex. 1, pp. 56-58). Tran ultimately submitted the grade report provided to her by the University of West Florida. (See doc. 26, Ex. 2, pp. 8-9, ¶ 18; doc. 35, Ex. 1, p. 56-57).

[13] The Progress Record Form used for intern evaluations consists of the following eight evaluation factors:
    A.    Problem Solving, Analysis and Research:
        Ability to analyze problems and discern basic issues, ability to identify, locate and interpret resource material; to use sound judgment in making recommendations and reconcile diverse

**she rated Tran "below track" on six of the eight evaluation factors and indicated Tran needed improvement in accomplishing her IDP.[14]**

---

      points of view.

B.   Learning and Application of Technical Knowledge and Skill:
Ability to grasp and apply fundamental and progressively more complex practices, theories, techniques and methodologies of the career field.

C.   Organization of Work:
Ability to organize work, establish realistic goals and means for attaining them, deal with changing priorities and adopt new methods.

D.   Instructions:
Ability to respond to oral and written instruction, work effectively with broad guidelines and complete assignments with minimal direction.

E.   Written Expression:
Ability to express/convey analyses, recommendations and information in writing, using appropriate grammar, style, and format within given deadlines.

F.   Oral Expression:
Ability to convey or acquire information from others verbally. Ability to secure agreement without friction and to establish/maintain effective professional relationships with people at all levels in the organization.

G.   Professionalism:
Cooperates well with others. Works well in a team. Gets along with co-workers.

H.   Promotion Potential:
Demonstrates characteristics indicative of potential for higher level positions.

(See doc. 26, Ex. 20, p. 59).

[14] Although Hunter indicated that Tran had satisfactorily completed work assignments and training during the time period covered by the evaluation (October 1, 2002 to March 31, 2003), Hunter indicated that Tran needed improvement in progressing through the accomplishment of her IDP and rated Tran "below track" on evaluation factors C-G. (See doc. 35, Ex. 10). The Progress Record Form requires a supervisor to provide comments if an intern's performance is weak or there is no promotion potential. (See doc. 26, Ex. 20, p. 59). Hunter attached the following comments, in relevant part, to Tran's evaluation:

C.   Organization of Work. Below. Often puts in for credit hours or comp time with no specific urgent project underway. Slow to produce results.

D.   Instructions. Below. Needs improvement in following rules. Examples where rules were not followed or disregarded include travel to New Orleans and taking college courses at UWF. Appears to either misunderstand the rules and regulations or chooses not to adhere to them. Example is workday on 19th when no one knew where she was.

E.   Written Expression. Below. E-mails are not always clear and concise.

F.   Oral Expression. Below. Has difficulty in explaining issues. Leaves out critical elements,

**Tran received two additional written evaluations. The first was from Dr. Maloy, her Rotational Supervisor at NETPDTC, for the period of February 18, 2003, to April 18, 2003. Maloy rated Tran as borderline between "on track" and "below track" on four of the eight evaluation factors.[15] Maloy indicated in the comment section of the evaluation that Tran's output was lower as compared to other interns who performed identical work and suggested that Tran be provided with English as a Second Language ("ESL") training.[16] The second evaluation was from Kendall Roose, Tran's Rotational Supervisor at the Air Traffic Control ("ATC") School of the Naval Air Technical Training Center.[17] Roose gave Tran a favorable evaluation on all factors.[18]**

**In May 2003, Tran was sent on a rotational assignment to the Training Support Center ("TSC") in Great Lakes, Illinois. During Tran's tenure at TSC, Hunter received**

---

>   which often change the meaning of the situation.
>
> F. (sic)  Professionalism. Below. Needs to improve team skills. Has not worked with any of the other interns on projects since first on. Appears to prefer to work in isolation.
>
> G.  Promotion Potential. Below. At the current level of progression, I cannot recommend Ms. Tran for a promotion to a GS-09 in July.

(Doc. doc. 35, Ex. 10).

[15] In preparing the evaluation, Maloy sought input from Hyer, Tran's daily direct supervisor. (See doc. 26, Ex. 9, p. 3). Maloy avers that in completing the evaluation, she placed check marks toward the right, left or middle of the boxes. (Id.). The location of the check mark indicated whether Tran was within the general designation of "on track." (Id.). Maloy placed check marks to the right side of the "on track" box, closer to the "below" box, on factors D-E and H. (See doc. 35, Ex. 8).

[16] Maloy's comments on Tran's evaluation were as follows:

> During her time at NETPDTC, Ms. Tran accomplished her work assignments. Her work involved the review of HP reference materials to determine whether they contained HP tools that would be useful on-the-job and also whether the reference should be a recommended reading. Her reviews were thorough and useful. Compared to other interns that did identical work, Ms. Tran was up to standard on quality, but her output was lower. One-on-one, Ms. Tran is a good worker and an adequate communicator. However, I recommend that she be provided with ESL training before Ms. Tran is assigned tasking that requires her to communicate up the chain-of-command, make management decisions, or obligate the government in any way.

(Doc. 35, Ex. 8).

[17] Tran spent ten days at the ATC School. (See doc. 26, Ex. 16, p. 1, ¶3).

[18] See doc. 35, Ex. 9.

unfavorable feedback from TSC supervisory personnel on Tran's progress.[19] Hunter ultimately terminated Tran from the program effective July 11, 2003.[20]

## LEGAL STANDARDS

### Summary Judgment

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (emphasis in original). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it may affect the outcome of the case under the applicable substantive law. See id.

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the adverse party may not rest on the mere allegations or denials of the moving party's pleadings. Instead, the nonmoving party must respond by affidavits or otherwise and present specific allegations showing that there is a genuine issue of disputed fact for trial. Fed. R. Civ. P. 56(e). When assessing the sufficiency of the evidence, the court must view all the evidence, and all factual inferences reasonably drawn therefrom, in the light most favorable to the nonmoving party. See Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993). A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a genuine issue of material fact and thereby preclude summary judgment. See Walker v. Darby, 911

---

[19] See doc. 35, Exs. 17-21, 24.

[20] See doc. 26, Ex. 5.

F.2d 1573, 1577 (11th Cir. 1990). If the adverse party fails to show a genuine issue of material fact, summary judgment, if appropriate, may be entered against the nonmoving party.

### Race and National Origin Discrimination

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race...or national origin." 42 U.S.C § 2000e-2(a)(1). A plaintiff may establish a prima facie case of intentional discrimination through (1) direct evidence, (2) circumstantial evidence or (3) statistical evidence. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Direct evidence is defined as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004) (quoting Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999)). It is "'evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption.'" Id. (quoting Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997)). Eleventh Circuit precedent limits direct evidence to that which is "...composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." Rojas v. Florida, 285 F.3d 1339, 1342, n. 2 (11th Cir. 2002) (quoting Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (citations and quotations omitted)).

In cases where a plaintiff relies on circumstantial evidence to prove a claim of discrimination, the claim is evaluated using the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, a plaintiff has the burden of establishing a prima facie case of discrimination which creates a rebuttable presumption that an employer acted unlawfully. Wilson, 376 F.3d at 1087. To

establish a prima facie case of race or national origin discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subject to adverse employment action; (3) her employer treated similarly situated employees outside her protected class more favorably; and (4) she was qualified for the position from which she was terminated. See Benitez v. Computer Horizons Corp., 2005 WL 3113217 at *2 (M.D. Fla. 2005) (citing Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003)); Van Meter v. Jefferson Smurfitt Corp., 1996 WL 640432 at *8 (N.D. Ga. 1996).

Once a prima facie case is established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Id. at 1361. The employer need not persuade the court that it was actually motivated by the proffered reason. Burdine, 450 U.S. at 254, 101 S.Ct. at 1094. This is a burden of production, not persuasion. Wilson, 376 F.3d at 1087. If the employer satisfies its burden by articulating one or more legitimate nondiscriminatory reasons for its action, the presumption of discrimination is rebutted and the burden of production shifts back to the plaintiff to offer evidence that the alleged reason is a pretext for illegal discrimination. Wilson, 376 F.3d at 1087. Despite the shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 1088 (quoting Burdine, 450 U.S. at 253, 101 S.Ct. at 1093, 1095). Should a plaintiff fail to establish a prima facie case, summary judgment is warranted. Grant, 259 B.R. at 752 (citing Pace v. Southern Ry. System, 701 F.2d 1383, 1391 (11th Cir. 1983)).

## DISCUSSION

Tran concedes she does not have any direct evidence or statistical evidence of discrimination.[21] Accordingly, in order to prevail on her claims she must adduce sufficient circumstantial evidence of discrimination utilizing the McDonnell Douglas

---

[21] See doc. 32, p. 4.

framework. There is no dispute that Tran is a member of a protected class because she is Asian and of Vietnamese national origin, and that she was subject to an adverse employment action when she was terminated from the NETC Internship Program.

As to the third element of the prima facie case, defendant argues that Tran cannot establish she was treated less favorably than the other intern who was supervised by Hunter or other interns in the NETC internship program and therefore cannot prevail on her Title VII claims. The gravamen of a discrimination claim requires a plaintiff to show that a similarly situated employee outside plaintiff's protected class was treated more favorably. Marcelin v. Eckerd Corp. of Fla., Inc., 2006 WL 923745 at *5 (M.D. Fla. 2006) (citing Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1313 (11th Cir. 1998) superseded in part by 151 F.3d 1321 (11th Cir. 1998)). "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that [she] and the other employees are similarly situated in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted); see also Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Jones, 137 F.3d at 1311. This element can be established in one of two ways. First, a plaintiff can show that she was replaced by someone outside her protected class. Casiano v. Gonzales, 2006 WL at *15 (N.D. Fla. 2006) (citing Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230 (11th Cir. 2004)). Second, she can show that she was treated less favorably than some other similarly situated employee. Id. (citing Gillis v. Ga. Dept. of Corrs., 400 F.3d 883 (11th Cir. 2005)). The failure by a plaintiff to demonstrate the existence of a similarly situated employee mandates summary judgment. Benitez, 2005 WL 3113217 at *2 (citing Holifield, 115 F.3d at 1562 ).

As a threshold matter, Tran has failed to specifically identify a non-Asian, non-

**Vietnamese employee in the internship program who was similarly situated to her but treated more favorably by her supervisor. More specifically, Tran has failed to identify any intern who received a similarly unfavorable evaluation from their homeport supervisor but was not terminated from the internship program.[22] See Jones, 137 F.3d at 1311. In response to the motion for summary judgment Tran argues that her supervisor treated her less favorably than other interns in that Hunter treated her "in a rude, unprofessional and unfriendly manner"[23] and did not provide her with written evaluations in accordance with the requirements set forth in the guide.[24] Tran however still fails to identify a comparator and these allegations raise no inference of discrimination. Furthermore, Tran has not presented any evidence that she was replaced by someone outside her protected class after she left the program. See Casiano, 2006 WL at \*15. As a result she cannot establish a prima facie case of discrimination.[25] See Benitez, 2005 WL 3113217 at \*2 (citing**

---

[22] In her response to defendant's motion for summary judgment, Tran simply argues that she was "similarly situated to other interns selected for the intern program." (See doc. 32, p 14). She does not identify any particular intern as a comparator. To the extent she may compare herself to Sonya Frazier, the only other intern directly supervised by Hunter, Tran does not articulate any specific allegations that she was treated less favorably than Frazier nor does she allege how Frazier was similarly situated to her. There is no evidence Frazier received an unfavorable evaluation from Hunter as Tran did.

[23] As evidence of other interns being treated more favorably, Tran points to the following: she did not receive support or guidance from Hunter; Hunter traveled a great deal and was too busy to help Tran; Hunter told Tran she did not know anybody in Tran's area of interest; Hunter would ignore her but talk to other people in the hallway; there was an unfriendly atmosphere between Tran and Hunter; Hunter forgot to prepare evaluations as required by the Intern Survival Guide; Hunter kept no written documentation on Tran except for the single written evaluation prepared in May 2003; other interns outside of Tran's protected class were evaluated by their supervisors; and the difference between Tran and the other interns is that they were allowed to complete the program. (Doc. 32, p. 15).

[24] The guide provides that interns are to be evaluated by their Homeport Supervisor, with input from their Mentor, every three months during their first year in the program. (See doc. 26, Ex. 20, p. 24; doc. 35, Ex. 15). Hunter provided Tran with only one evaluation in April 2003. (See doc. 26, Ex. 4; doc. 35, Ex. 10). Hunter admits she forgot to evaluate both Tran and Frazier in contravention of the program requirements. (See doc. 35, Ex. 2, pp. 32-33).

[25] As to the remaining element of the prima facie case, because Tran has introduced some evidence in response to defendant's motion for summary judgment that she was minimally qualified for the internship position, the court will assume arguendo that she was qualified for her job. Notwithstanding and assuming that Tran could otherwise satisfy the prima facie case, the court would nevertheless grant summary judgment for defendant. Defendant has articulated a legitimate business reason for terminating Tran, namely Tran's record of performance deficiencies, (See Marcelin, 2006 WL 923745 at \*5) and Tran has failed to establish that defendant's reason for terminating her was pretextual. An employer may discharge a plaintiff "for good

**Holifield**, 115 F.3d at 1562).

Accordingly, it is hereby ordered:

1. Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment and Accompanying Documents (doc. 28) is DENIED; and

2. Defendants' Motion for Summary Judgment (doc. 25) is GRANTED and final judgment is entered in favor of defendant on plaintiff's claims, and plaintiff shall take nothing in this action.

**DONE AND ORDERED on this 9th day of August 2006.**

*s/ M. Casey Rodgers*
**M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE**

---

reason, bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Kelada v. Hillsborough County, 1997 WL 122851 at *9 (M.D. Fla. 1997) (quoting Nix v. WLCY Radio/Rahall Communications, 738 F.Supp. 1181, 1187 (11th Cir. 1984)). There is no record evidence to suggest that Hunter's indifference to Tran or her failure to provide Tran with timely written evaluations was motivated in any way by Tran's race or national origin. Absent such a nexus, there is no basis upon which the court could find that the decision to terminate Tran was motivated by discriminatory animus.